IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RORY GAUNT and JULIE GAUNT, )
)
Plaintiffs, )
)
vs. ) No. 04 C 6144
)
STEVEN SCHADA, KAREN SCHADA, )
and SCOTT SCHADA, )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Rory and Julie Gaunt (the Gaunts) brought this action against defendants Steven Schada, Karen Schada and Scott Schada (the Schadas) for specific performance on a real estate contract. Defendants filed a motion for summary judgment and plaintiffs filed a cross-motion for summary judgment. For the following reasons, defendants' motion is denied and plaintiffs' motion is granted.

## BACKGROUND

The following facts are taken from the parties' Rule 56 statements of uncontested facts. Unfortunately, neither plaintiffs nor defendants responded to the others' statement of facts as required under Local Rule 56(b)[1]. Nonetheless, based on the parties' statements and exhibits, the following is uncontested. At the center of this dispute is a vacation home in New Buffalo,

---

[1] (b) Opposing Party. Each party opposing a motion filed pursuant to Fed.R.Civ.P. 56 shall serve and file —
  (1) any opposing affidavits and other materials referred to in Fed.R.Civ.P. 56(e);
  (2) a supporting memorandum of law; and
  (3) a concise response to the movant's statement that shall contain:
    (A) a response to each numbered paragraph in the moving party's statement, including in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and
    (B) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon. All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.

Michigan, near the shores of Lake Michigan. In February 2004, plaintiffs, residents of Massachusetts, entered into a contract with defendants, residents of Illinois, for the purchase of the property. Steven and Karen Schada, husband and wife, initially owned the property with Steven's brother, Scott; however, in May 2004, Steven and Karen purchased Scott's interest. The Gaunts agreed to pay the Schadas $635,000 for the property, and deposited $5,000 in escrow as earnest money.

After entering into their sale agreement, the parties executed two subsequent addenda to the contract (Addendum 2 and Addendum 3). The second addendum, signed by the parties on March 5 and 6, 2004, recited that the home inspector found problems with the roof, electrical service and septic system, and allowed for additional time to assess the repairs needed. The third addendum, signed March 19, 2004, provided that the sale price would remain the same, but defendants would receive an $80,000 credit on the sale price at the time of closing. It also specified that the sale would be insured by Chicago Title Insurance Co. (Chicago Title). In addition, the addendum added the contract's first mention of the property's private beach rights. It stated: "Seller represents and warrants that private beach rights to Sturgeon Beach are included in sale of property." Plaintiffs testify in affidavits that these beach rights, which allow an occupant to easily walk from the property to a private association beach, influenced their decision to purchase the property.

The real estate contract stated that the sale of the property "shall be closed on May 1, 2004, or before, if mutually agreed by the parties." The closing date was subject to two exceptions noted in the contract: buyers could have up to fifteen extra days in order to secure a new mortgage, for which they have a written commitment, and sellers could have up to thirty additional days in order to correct defects in the property's title. Believing all the documents to be in order, the Gaunts and the Schadas agreed to close on April 16, 2004, two weeks before

the contract's stated closing date. However, on April 14, 2004, Charles Hilmer, plaintiffs' attorney, received a revised copy of the title commitment from Chicago Title. Hilmer had already reviewed an earlier copy of Chicago Title's commitment to insure the property and the beach access rights. Unlike the previous version, the revised title commitment did not commit to insure the property's beach access rights. On or about March 16, 2004, neighbors of the Schadas filed suit seeking to clarify which owners in the residential area had beach access rights. The action named the Schadas among the defendants. As a result of this beach rights litigation, Chicago Title would not commit to insure the property's beach access rights.

On April 15, 2004, the day before the parties' scheduled early closing, Hilmer faxed defendants' counsel Lawrence Frankle a letter informing him that Rory Gaunt was concerned about "the unusual liabilities and expenses that he will be exposed to due to the purchase" and that he would not proceed with the closing unless he received a $150,000 reduction in the sale price. Frankle faxed a reply letter that same day stating that there were no unusual liabilities or expenses, and though they would not agree to a price reduction they would be willing to escrow a certain amount of money to allay any anxieties regarding the purchase. Nonetheless, the letter informed plaintiffs that defendants expected them to close the next day, as scheduled. However, plaintiffs did not show up at the closing the next day.

Following the aborted early closing, the parties remained in communication. In a letter to Frankle dated April 27, 2004, Hilmer discussed attempts to settle the beach rights issue. He explained that defendants' attempt to attain insurance for the beach rights from Metropolitan Title would not satisfy his clients because the realty contract states that Chicago Title will provide the title insurance. The letter informed defendants that plaintiffs would purchase the property on the closing date without title insurance for the beach access rights, if the price was reduced by $150,000. Without this price reduction, the letter warned that plaintiffs would

terminate the contract and request a return of their earnest money. The parties did not close on May 1, 2004.

In his declaration, Hilmer states that following their exchange of letters, Frankle told him that he thought he could get the beach rights litigation dismissed, allowing plaintiffs to get title insurance for the beach rights. On June 22, 2004, Frankle faxed Hilmer a copy of a proposed summary judgment order in the beach rights litigation. Two weeks later, Frankle faxed Hilmer a copy of the order dismissing the case, signed by the state court judge adjudicating the matter. Once the judge had dismissed the beach rights litigation, Frankle notified Chicago Title. In a letter dated July 20, 2004, Frankle inquired whether the title company would reinstate its earlier title commitment covering the property's beach rights. The letter stated: "Our buyers in the Schada sale, Rory and Julie Gaunt, are still willing to go forward with the purchase of the Schadas' property if Chicago Title will reinstate the commitment issued prior to this lawsuit being filed." At no point prior to this had either party issued written notification terminating the contract, nor had either party moved to recover the earnest money plaintiffs had deposited for the purchase the property.

On July 30, 2004, Frankle faxed a letter to Hilmer, which he did not receive until August 6, 2004. The letter read: "The Schadas will sell to your client and provide a warranty deed with beach rights, as well as title insurance showing beach rights, but the purchase price will be $600,000.00 and closing will be within two weeks." Hilmer replied on August 12, 2004, that plaintiffs were ready to close on a mutually convenient date, but that they would need to arrange the date with their lender. Defendants demand for $45,000 more than the price agreed to in their prior contract and addendum, and their refusal to accommodate a later closing date led plaintiffs to file this action for specific performance on September 21, 2004. In late August, or early September, prior to plaintiffs filing suit, defendants entered into a sales

agreement with a third party to sell the property for $625,000.

## DISCUSSION

Our function in ruling on a motion for summary judgment is to determine if there is a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the evidence on file shows that no such issue exists and the moving party is entitled to judgment as a matter of law we will grant the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Bennett v. Roberts, 295 F.3d 687, 694 (7th Cir. 2002). A "metaphysical doubt as to the material facts" is not enough to create a genuine issue of fact for trial, Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 (1986); the evidence must allow for a reasonable trier of fact to find for the non-movant. Buscaglia v. United States, 25 F.3d 530, 534 (7th Cir. 1994). When reviewing a motion for summary judgment, we draw all inferences in the light most favorable to the non-movant. DeValk Lincoln Mercury, Inc. v. Ford Motor Co., 811 F.2d 326, 329 (7th Cir. 1987). The court considers the plaintiffs' and the defendants' cross-motions independently – the failure of one party's motion for summary judgment does not mandate the success of the motion of the other party.

The Michigan Supreme Court has repeatedly stated that "specific performance is not a remedy or right but rests in the sound discretion of the court." Friedman v. Winshall, 343 Mich. 647, 653, 73 N.W.2d 248, 252 (Mich. 1955). Though equitable principles should be applied in each case, and specific performance may not be arbitrarily refused, a decision on specific performance depends on the particular circumstances of the case. Id.; First Baptist Church of Dearborn v. Solner, 341 Mich. 209, 216, 67 N.W.2d 252, 255 (Mich. 1954).

In their motion for summary judgment, defendants argue that plaintiffs are not entitled to specific performance because they never tendered performance and they breached the contract. Defendants contend that plaintiffs failed to tender the agreed upon purchase price

by the date required in the sale contract, May 1, 2004. They further maintain that plaintiffs' refusal to close the real estate contract on or before May 1, 2004, unless defendants reduced the price by $150,000, amounted to a breach of contract.

Plaintiffs requested the price reduction due to "unusual liabilities and expenses" stemming from the beach rights litigation. Regardless of plaintiffs' perceptions, defendants contend that the inability to get title insurance from Chicago Title for the beach access rights did not amount to a title defect. They argue that the sale contract provided that "the seller shall furnish an Owner's Policy of Title Insurance in the amount of purchase price," which they did. As the legal description of the property does not include beach access rights, and the sale contract does not mention them, except in an addendum in which defendants warranty the rights, they contend there was no basis for delay in the closing. Moreover, defendants assert that even if the inability to attain title insurance from Chicago Title for the beach access rights did create a title defect, plaintiffs' options under the contract were limited. They could either have waived any perceived defect in title and closed, or notified defendants of the defect and allowed them up to thirty days after the closing date to cure the defect. Citing to paragraph 6 of the real estate agreement, defendants argue that since the alleged title defect was not cured within the thirty days after the required closing date, the contract terminated and the escrowed earnest money should return to plaintiffs. Title defect or no defect, breach by plaintiffs or no breach, defendants contend that their contract with plaintiffs terminated and plaintiffs are not entitled to specific performance.

In their response to defendants' summary judgment motion and their cross-motion for summary judgment, plaintiffs argue that they were ready and able to perform under the contract; however, they were not obligated to proceed until defendants could provide title insurance for the property's beach rights, or at least a merchantable title. Further, plaintiffs

maintain that they did not need to make a formal tender of the purchase money knowing that defendants could not perform under the contract, and that even if they had a duty to meet the May 1, 2004, closing deadline, defendants had waived that deadline. After May 1, 2004, and after thirty additional days had passed during which defendants allegedly sought to address the beach access rights, defendants never attempted to recover the earnest money or terminate the contract due to plaintiffs' breach. Plaintiffs argue that during this time period defendants sought to dismiss the beach rights litigation and secure the appropriate title insurance, keeping plaintiffs' attorney informed of relevant developments throughout the process. They contend that once defendants were able to provide title insurance for the beach access rights, plaintiffs should have been allowed to tender the agreed-upon purchase price on a mutually convenient closing date. Instead, defendants issued a new offer requiring that plaintiffs pay an additional $45,000 at a closing to be held within two weeks from the date of the offer.

The first question we must address is whether defendants' inability to provide title insurance from Chicago Title on the beach access rights constituted a defect on the title or impeded them from providing a merchantable title. If it did not, then plaintiffs had no basis on which to refuse to perform and, therefore, their failure to tender the purchase price by May 1, 2004, constituted a breach of contract. But, if it did, then plaintiffs were not under an obligation to close by May 1, 2004, and defendants were allowed a reasonable amount of time, up to thirty days after May 1, 2004, to cure the defect. It is our finding that the lack of Chicago Title insurance on the beach access rights was a defect in the title.

The undisputed facts show that both plaintiffs and defendants understood the real estate purchase to include a property with beach access rights. The real estate listing for the property stated that it was "just 150 steps to Lake Michigan and one of the finest private association beaches in the area." Both Steven Schada and Karen Schada testified in their

depositions that the contract to sell the property to plaintiffs included the beach access rights (Steven Schada dep. 14; Karen Schada dep. 12-14). An understanding that the sale included beach rights is further evidenced by the original title commitment that Chicago Title issued for the property. Chicago Title included coverage of "a perpetual easement for recreational purposes." The later revised copy of the title commitment removed this language due to the beach rights litigation. Finally, Steven Schada acknowledged in his deposition that the beach access rights accounted for some of the monetary value of the property. As the real estate agreement required title insurance to cover the whole purchase price, the insurance had to cover the value derived from the access rights. Thus, the Schadas' failure to provide plaintiffs with Chicago Title insurance covering those rights by May 1, 2004, absolved plaintiffs of the obligation to tender the purchase price by that date.

Since the title insurance did not cover the whole of the property as the parties understood it, a title defect existed, triggering the provisions of paragraph 6 of the agreement. This paragraph provides that "Seller shall have a reasonable time not exceeding thirty (30) days from the last closing date as set forth in paragraph 4 above to correct defects in title even though the date of closing is delayed thereby." The next question is what happens if the seller is unable to correct the defect within thirty days, but neither party moves to terminate the contract thereafter? Defendants contend that after the thirty days the seller has no duty to address the title defects and that the contract terminates by its own terms. Plaintiffs, on the other hand, maintain that the contract contains no provision concerning automatic termination, and the time limitation on the ability to cure the title is a protection for buyers, which both plaintiffs and defendants chose to waive.

Defendants rely on various unpublished decisions from Michigan appellate courts to support the proposition that their contract with the Gaunts terminated when they were unable

to cure the alleged defect in the title within thirty days of the scheduled closing. *See* <u>Green v. Perkins</u>, 2004 WL 2389192 at *1 (Mich.App. 2004); <u>Karkoukli's v. Walgreen Co.</u>, 2004 WL 435384 at *1 (Mich.App. 2004); <u>Tasch v. Niedzielski</u>, 2004 WL 895863 at *1 (Mich.App. 2004). These opinions are revealing in their distinctions from the instant case. In <u>Green</u>, where the plaintiff buyer sought specific performance on a real estate contract, the court upheld summary judgment for the defendant seller. 2004 WL 1289192 at *1. The real estate contract in <u>Green</u>, like the Gaunt/Schada contract, allowed the seller thirty days after receiving notice of any title defects to remedy the title. *Id.* Unlike the Gaunt/Schada contract, the <u>Green</u> contract also gave the sellers the option that "[i]f unable to remedy the title to refund the deposit in full termination of this agreement." *Id.* The court found that the sellers were unable to remedy the title within thirty days and thus could exercise their option under the contract to refund the deposit and terminate the agreement. *Id.* at *2.

Specific provisions in the parties' real estate contract also led to the termination of the contract in <u>Karkoukli's</u>. 2004 WL 435384 at *5. That contract stated that unless the buyer gave notice of its satisfaction with certain conditions, it would automatically terminate. *Id.* at *5-6. Since the buyer had not provided such notification, the court held that the contract terminated and the buyers was not liable for breach of contract. *Id.* The Gaunt/Schada contract does not contain any language remotely similar to the automatic termination provision in <u>Karkouli's</u>.

In <u>Tasch</u>, the plaintiff seller sought damages against the defendant buyer for failing to complete a real estate sale after the seller was unable to obtain a marketable title. 2004 WL 895863 at *1. The parties' contract stated that if the title insurance commitment revealed an unmarketable title, the seller would have the opportunity to cure the title defects. *Id.* at *2. However, if the seller could not cure the defects within thirty days, the buyer could waive the

defect or terminate the agreement by written notice and recoup his deposit. *Id.* The contract also stated that "[t]his sale is to be closed on or before October 22, 1999." *Id.* Though the buyer neither waived the title defect, nor gave written notice of termination, the court held that the agreement terminated because the seller did not have a marketable title on October 22, 1999, the contractual deadline. *Id.*

The Schadas argue that their contract likewise terminated on May 1, 2004, when they were unable to provide acceptable title. There are several problems with this argument. Unlike in <u>Tasch</u>, the Gaunt/Schada contract specifically provides for an extension of thirty days beyond the specified closing date. Thus, by the contract's own terms the closing date does not act as an automatic termination date. Furthermore, the Michigan Supreme Court has stated that "[t]he bare naming of time for performance or when payments are to be made does not necessarily make time of the essence of the contract in a court of chancery." <u>Elbom v. Pavsner</u>, 225 Mich. 213, 223, 196 N.W. 442, 445 (Mich. 1923); *see* <u>Al-Oil, Inc. v. Pranger</u>, 365 Mich. 46, 53, 112 N.W.2d 99, 102-03 (Mich. 1961). Thus, the closing date included in the Schada's contract is not immutable, as revealed by the contract's contingency terms regarding the discovery of a title defect.

Another significant distinction between <u>Tasch</u> and the instant case is the role of the parties. In <u>Tasch</u>, the court found that the seller could not seek damages from the buyer for failure to perform under the contract, after the seller was unable to provide marketable title within the allotted amount of time. 2004 WL 895863 at *2. In the instant case, the sellers attempt to use this decision to argue that their inability to cure the title defect within the allotted amount of time automatically relieves them of any obligation to perform under the contract. But the thirty-day time limit for remedying the title protects the buyer from waiting "an unreasonably long period of time without knowing if the transaction can be completed

before looking for a different, problem-free property." *Id.* The Gaunts maintain that they waived this limit, agreeing to wait to see if defendants could cure the title defect through the dismissal of the beach rights litigation. Even in <u>Tasch</u>, where the specified closing date automatically terminated the contract, the court recognized that the parties could agree to a later closing date than the one specified in the sale contract. *Id.* at *2. While there is no evidence that the Gaunts and Schadas set a new closing date, there is undisputed evidence that the parties, through their attorneys, acted as if the contract was still pending, while defendants sought to dismiss the beach rights litigation and then re-attain title insurance for the beach access rights. Defendants' attorney acknowledged this when he informed Chicago Title that the Gaunts were still willing to purchase the Schada's property, if the title company reissued its title commitment covering the beach rights.

Plaintiffs analogize this waiver of the thirty-day limitation to the parties' waiver in <u>Al-Oil, Inc.</u> There, the parties' real estate contract provided that the sale was contingent on the buyer receiving, within thirty days, the necessary city zoning permits for operating a gas station on the property. 365 Mich. at 48, 112 N.W.2d at 100. The buyer did not receive the permits until more than 120 days after the defendant accepted its offer. 365 Mich. at 49, 112 N.W.2d at 101. Yet, in the interim, neither party sought to terminate the contract. Rather, they remained in contact concerning the progress of the permit approval process. However, once the city approved the permits, the defendant refused to sell to the buyer. The court held that the parties waived performance of the contract within the sixty days designated, and therefore the contract did not terminate when the sixty days expired. It quoted 17 C.J.S. Contracts § 506 for the general rule:

> Where a stipulation for performance at a particular time has been waived, the party in whose favor the waiver operates is thereafter bound only to perform within a reasonable time, except in a case where there has been a specific

extension of time, in which case it is held that the new time fixed becomes of the essence, as was the case in the original contract. So, where the time fixed by the contract for performance is permitted to pass, both parties concurring, the time of performance thereafter becomes indefinite, and one party cannot rescind until full notice and a reasonable time for performance is given.

Undisputed facts establish that the Gaunts and Schadas likewise waived the thirty-day limitation for curing the title defect. As the parties did not set a fixed time, the time for performance became indefinite. Defendants' demand that plaintiffs close on the transaction within two weeks after sending notice that they attained title insurance for the beach access rights was not reasonable given plaintiffs' need to coordinate with their mortgage company.

## CONCLUSION

We find that the parties' February 25, 2004, real estate agreement and subsequent addenda did not terminate and plaintiffs are entitled to specific performance of the contract. Defendants' motion for summary judgment is denied, and plaintiffs' cross-motion is granted.

JAMES B. MORAN
Senior Judge, U. S. District Court

June 13, 2005.